1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10

11    PRENTICE MARSHALL,                      Case No.16-cv-02115-JSC

              Plaintiff,

12

13         v.                                 **ORDER RE: CROSS-MOTIONS FOR
                                              SUMMARY JUDGMENT**

14    NANCY A. BERRYHILL,                      Re: Dkt. Nos. 15, 17

              Defendant.

15

16

17          Plaintiff Prentice Marshall seeks social security benefits for a combination of physical and

18    mental impairments, including: borderline intellectual functioning, language disorder, cognitive

19    disorder, mood disorder, and post-traumatic stress disorder.  Plaintiff brings this action pursuant

20    to 42 U.S.C. Section 405(g), seeking judicial review of a final decision by Defendant Nancy A.

21    Berryhill, the Acting Commissioner of the Social Security Administration, denying Plaintiff's

22    application for disability benefits.[1]  Now pending before the Court is Plaintiff's motion for

23    summary judgment and Defendant's cross-motion for summary judgment.[2]  (Dkt. Nos. 15, 17.)

24

25

26    _____

27    [1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is
      therefore substituted for Carolyn W. Colvin as the Defendant in this action.  *See* 42 U.S.C. §
      405(g); Fed. R. Civ. P. 25(d).

28    [2] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
      636(c).  (Dkt. Nos. 2 & 9.)

For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Plaintiff's

Motion for Summary Judgment and DENIES Defendant's Cross-Motion for Summary Judgment.

## LEGAL STANDARD

A claimant is considered "disabled" under the Social Security Act if he meets two

requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be

severe enough that she is unable to do her previous work and cannot, based on his age, education,

and work experience "engage in any other kind of substantial gainful work which exists in the

national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an

ALJ is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity"; (2)
> whether the claimant has a "severe medically determinable physical
> or mental impairment" or combination of impairments that has
> lasted for more than 12 months; (3) whether the impairment "meets
> or equals" one of the listings in the regulations; (4) whether, given
> the claimant's "residual functional capacity," the claimant can still
> do his or her "past relevant work"; and (5) whether the claimant
> "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL BACKGROUND

On January 28, 2004, Plaintiff filed an application for children's Supplemental Security

Income. (Administrative Record ("AR") 72.) The Social Security Administration ("SSA")

approved the request, and Plaintiff received benefits on the basis of his borderline intellectual

functioning. (AR 121.) Near Plaintiff's eighteenth birthday, the SSA conducted an eligibility

redetermination, and classified Plaintiff as no longer disabled as of February 1, 2011. (AR 90.)

Plaintiff filed a request for reconsideration, and members of his family submitted an adult function

report. (AR 451.) The SSA determined Plaintiff was no longer eligible for benefits on January 8,

2013. (AR 98.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which

was originally scheduled for January 22, 2014. (AR 11.)  However, Plaintiff obtained counsel and the hearing was continued until June 18, 2014. (*Id*.)  A supplemental hearing was held approximately one month later, during which Plaintiff and vocational expert ("VE") Christopher Salvo testified.  (AR 47.)  On July 30, 2014, the ALJ issued a written decision denying Plaintiff's application and finding that Plaintiff was "not disabled under the framework of section 204.00 in the Medical-Vocational Guidelines." (AR 20.)  Plaintiff filed a request for review, which the Appeals Council denied on February 17, 2016. (AR 1.)  Plaintiff initiated this action approximately three months later, seeking judicial review of the SSA's disability determination under 42 U.S.C. Section 405(g).  (Dkt. No. 1.) The parties' cross-motions for summary judgment are now pending before the Court. (Dkt. Nos. 15 & 17.)

## FACTUAL BACKGROUND

Plaintiff was born on February 21, 1993.  (AR 71.)  He has no employment history and lacks stable living conditions.  (AR 40.)  In addition to his borderline intellectual functioning, Plaintiff has been diagnosed with post-traumatic stress disorder and major depressive disorder. (AR 13.)

## I. MEDICAL EVALUATIONS AND HISTORY

As a result of Plaintiff's medical conditions, he obtained medical care through Contra Costa County Mental Health Services.  In addition, as part of his application for disability benefits, he participated in SSA directed examinations to determine whether his impairments are disabling.  A discussion of the relevant medical evidence follows.

### A.    Medical History

#### 1) Initial Disability Diagnosis

When Plaintiff was approximately eight years old, he underwent a comprehensive assessment to determine the underlying cause for his delayed progress in school.  (AR 517.)  As part of this assessment, Plaintiff's underwent a series of exams to determine his language, physical, and emotional functioning, as well as his intellectual and adaptive behavior.  (AR 517-522.)  Plaintiff's verbal IQ was measured at 79, his performance IQ at 73, and his full scale IQ at 74.  (AR 519.)  Plaintiff was diagnosed with borderline intellectual functioning and a language

1   disorder which "functionally equals the listings" contained in 20 C.F.R. § 416.926(a). (AR 524,

2   531.)

3       **2) Adult Medical Care**

4       Following the termination of his childhood benefits, on April 5, 2012, Plaintiff was

5   underwent a clinical assessment at the Contra Costa County Health Services ("CCHS") clinic in

6   Concord. (AR 623.)  Plaintiff presented complaining that he was having frequent nightmares and

7   reported hearing his stepfather's voice as he beat his mother, five brothers, and two sisters.  (*Id*.)

8   Additionally, Plaintiff indicated he was depressed, irritable, suffered from poor sleep, and

9   possessed a history of attempted suicide after he overdosed on his mother's medication four years

10  prior.  (*Id*.)  Plaintiff was diagnosed with post-traumatic stress disorder, major depressive disorder

11  with psychotic features, cannabis abuse, and an Axis II disorder.  (AR 626.[3])  An assessment of

12  Plaintiff's functional impairment indicated that he possessed moderate impairment in self-care,

13  social relations, substance abuse, and daily activities.  He was deemed to have no impairment in

14  family relations or physical health.  (*Id*.)

15      One week later, Plaintiff returned to CCHS for an initial psychiatric assessment with Dr.

16  Wang.  Plaintiff stated that he was having "bad thoughts" and felt as though he needed help.  (AR

17  629.)  Dr. Wang diagnosed Plaintiff with post-traumatic stress disorder and major depressive

18  disorder with psychotic features.  (AR 631.)  Further, Dr. Wang rated Plaintiff's Global

19  Assessment of Functioning Scale ("GAF") score at 50.[4]  At this time, Dr. Wang prescribed his

20  first round of medication (Zoloft) to Plaintiff.  (AR 632.)  Dr. Wang conducted a functional

21

22  _____

[3] Although Axis II denotes multiple conditions, in this case, Axis II disorder refers to Plaintiff's
23  borderline intellectual functioning. *See Garrison v. Colvin*, 759 F.3d 995, 1003 (9th Cir. 2014)
    (Describing Axis II as "Borderline Intellectual Functioning, by examination).
24  [4] A Global Assessment of Functioning Scale score is a rough estimate of an individual's
    psychological, social, and occupational functioning used to reflect the individual's need for
25  treatment." *Brewes v. Comm'r of Soc. Sec*., 682 F.3d 1157, 1165 n.1 (9th Cir. 2012). The score
    ranges from zero to 100, and serves as a subjective determination that represents the clinician's
26  judgment of the individual's overall level of functioning. *See Sigmon v. Kernan*, No. 06-5807-
    AHM(JWJ), 2009 WL 1514700, at *9 n.3 (C.D. Cal. May 27, 2009). "A GAF score of 41 to 50
27  indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)
    or any serious impairment in social occupational, or school functioning (e.g., no friends, unable to
28  keep a job)." *Quiana La Nay Chase v. Colvin*, No. 13-1816-KAW, 2014 WL 4544096, at *10
    (N.D. Cal. Sept. 12, 2014) (internal citation and quotation marks omitted).

4

United States District Court
Northern District of California

impairment assessment, concluding that Plaintiff possessed moderate to severe family relations, and fair to moderate work/school performance impairment. (AR 631.) Dr. Wang indicated Plaintiff's self-care, peer relations, and substance use impairments were mild. (*Id*.) Dr. Wang concluded Plaintiff did not possess physical health impairments. (*Id*.)

During the next six months, Plaintiff met with Dr. Wang a total of four additional times and cancelled two appointments. (AR 641-650.) During Plaintiff's September 12, 2012 visit with Dr. Wang he stated: "I don't feel much better, and am mad all the time." (AR 620.) Plaintiff also reported that the medication made him nauseous. (*Id*.) As a result, Dr. Wang prescribed Zyprexa. (AR 621.)

Nine months later, CCHS contacted Plaintiff to determine whether a discharge of services was necessary because he had failed to make follow-up appointments. (AR 668.) Plaintiff stated he was conflicted about whether he was able to return for services due to inadequate transportation. (*Id*.) Plaintiff made a follow-up appointment with Dr. Wang for two months later. (*Id*.) At that visit, Dr. Wang conducted a psychiatric assessment update, concluding that there was no change in Plaintiff's diagnosis. (AR 660.) Plaintiff continued to complain of nausea with the Zoloft, so Dr. Wang prescribed Remeron. (*Id*.)

Dr. Wang contacted Plaintiff on February 7, 2014 when he failed to show up for his appointment. (AR 759-60.) Plaintiff stated that he was "stranded in Sacramento." (AR 759.) Plaintiff reported that he was taking the Remeron sporadically because it was causing GI problems. (*Id*.) He also indicated that he did not think Remeron was helping as he was still getting angry and having nightmares, and he was still "a little depressed." (*Id*.)

Two months later, Plaintiff saw Dr. Wang and indicated that there had been no change in how he was feeling and stated "I feel like I need something stronger." (AR 748.) Dr. Wang switched Plaintiff's prescription to Seroqeul, an antipsychotic drug. (*Id*.) Two months later, Plaintiff showed no improvement on the new medication. (AR 763.) Plaintiff indicated that Seroquel was "strong, but it doesn't necessarily knock him out." (*Id*.) He stated that his mood was unchanged, and he continues to hear voices. (*Id*.) Plaintiff reported he generally kept to himself

and did not go out in public much.  (*Id*.)  Dr. Wang suggested cutting Plaintiff's Seroquel dose in half and added a prescription for Prozac.  (AR 764.)

## B.    Medical Evaluations

Plaintiff underwent three examinations at the direction of the SSA to determine whether his impairments were disabling.  Below is a summary of these evaluations.

### 1)  Medical Evaluations Regarding Plaintiff's Mental Impairments

#### a) Examining Physician Dr. Chen[5]

Dr. Frank Chen performed an evaluation of Plaintiff at the request of the Agency in December 2011.  (AR 536.)  Before talking to Plaintiff, Dr. Chen reviewed the Adult Disability Report and the Adult Function Report.  Plaintiff told Dr. Chen that he did not have any specific physical complaints and stated that he can cook, do housework, wash dishes, do laundry, buy groceries, and go for walks.  (*Id*.)  Plaintiff did not report being on any medication.  (*Id*.)  Dr. Chen concluded that Plaintiff's physical examination was within normal limits, and he did not conduct any psychological exams.  (AR 537.)

#### b) Examining Physician Dr. Meek

During an examination with Dr. Meek approximately one month later, Plaintiff indicated he "is awake until the sun comes up five days a week." (AR 539.)  He required reminders to take his medication, and to bathe and dress according to the weather.  Plaintiff indicated he was afraid of shaving and of darkness.  Plaintiff reported he suffered from anxiety attacks, possessed the ability to pay attention for approximately twenty-thirty minutes, and has become violent.  (*Id*.)  Dr. Meek concluded that Plaintiff should be able to do routine work without public contact.  (AR 540.)

//

//

---

[5]  Plaintiff attached a letter from the California Department of Social Services Disability Determination Service Division to his motion for summary judgment.  (Dkt. No. 15-1.)  The letter states that as of December 30, 2013 Dr. Chen was no longer authorized to perform consultative examinations due to "Dr. Chen's unprofessional manner and failure to adequately correct deficiencies in his CE reports."  (*Id*.)  The Commissioner does not dispute the accuracy of this letter.  (Dkt. No. 17 at 3 n.2.)

### c) Examining Psychologist Dr. Sokley Khoi

One month later, Dr. Sokley Khoi conducted a psychological disability evaluation on Plaintiff.  (AR 544.)  Plaintiff told Dr. Khoi he had problems with learning and anger control. (*Id.*)  Plaintiff indicated that he had been hospitalized in 2008 because he had homicidal and suicidal thoughts.  (*Id.*)  Plaintiff also indicated that he had difficulty with eating and sleeping. (*Id.*)  As part of his psychiatric history, Plaintiff reported he was prescribed medication for his anger issues, but he refused to take the medication.  (AR 545.)  He indicated that he was not currently taking any medication.  (*Id.*)  Plaintiff stated that he occasionally used marijuana for his appetite and to calm down.  He noted he last smoked "a joint" a week prior.  (*Id.*)  As to his activities of daily living, Plaintiff stated that he possessed the ability to do all activities of daily living, with restrictions because he is easily frustrated. (*Id.*)  Usual activities include socializing with family and friends and going on walks.  (*Id.*)

During his mental status examination, Dr. Khoi noted Plaintiff was unable to correctly complete "serial sevens," an exam where an individual is tasked to count down from one hundred by sevens.  However, Plaintiff was able to recall 3/3 words after short delay and was able to spell "WORLD" backwards.  (*Id.*)  Plaintiff's speech "sometimes showed hesitation" and he had some difficulties following a simple 3-step command.  (*Id.*)  Dr. Khoi also administered the Wechsler Adult Intelligence Scale exam to the Plaintiff—the adult version of the exam Plaintiff took as a child.  (AR 545-56.[6])  Plaintiff's full scale IQ of 74 dropped from borderline intellectual functioning to a score of 52, which placed Plaintiff in the extremely low intellectual functioning category.  (AR 546.)  However, Dr. Khoi remarked that although the test results indicated extremely low intellectual functioning, Plaintiff's cognitive functioning is "more commensurate with borderline functioning."  (AR 547.)

Finally, Dr. Khoi rated Plaintiff's GAF score at 50, and recommended that Plaintiff may benefit from individual psychotherapy and psychotropic medications.  (*Id.*)  Dr. Khoi concluded

---

[6] Dr. Khoi indicated the version administered was "limited in scope and based on a single, time-limited session of client contact with pre-authorized tests."  (AR 546.)  With this in mind, Khoi offered her diagnostic and clinical impressions and disability considerations.

United States District Court
Northern District of California

that Plaintiff was not cognitively able to manage his own funds, and had marked levels of impairment in his ability to follow and remember complex/detailed instructions and maintain adequate pace or persistence to perform complex tasks. (*Id*.)

### d) Residual Functional Capacity Assessment by Dr. Meenakshi

Two weeks later, Dr. Meenakshi reviewed all the evidence in Plaintiff's file and conducted a mental residual functional capacity assessment of Plaintiff's impairments using the standard checkbox form. (AR 549-51.) The assessment is divided into four sections, including: 1) Understanding and Memory; 2) Sustained Concentration and Persistence; 3) Social Interaction; and 4) Adaptation. (*Id*.) A total of 20 different "abilities" are analyzed on a sliding scale, starting with "not significantly limited," followed by "moderately limited," and finally, "markedly limited." (*Id*.) There are also two other options on the scale: no evidence of limitation, and not ratable on available evidence. Dr. Meenakshi did not find Plaintiff markedly limited in any area, but found Plaintiff as moderately limited in 7 of 20 abilities, with the remaining 13 abilities classified as "not significantly limited." (*Id*.) The moderately limited abilities include: 1) the ability to understand and remember detailed instructions; 2) the ability to carry out detailed instructions; 3) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 4) the ability to work in coordination with or proximity to others without being distracted by them; 5) the ability to interact appropriately with the general public; 6) the ability to accept instructions and respond appropriately to criticism from supervisors; and 7) the ability to respond appropriately to changes in the work setting. (AR 549-50.) Dr. Meenakshi concluded Plaintiff possessed the ability to perform simple tasks with limited public contact. (AR 551.)

Finally, Dr. Meenakshi conducted an assessment to determine whether Plaintiff's impairments met disability classifications under 20 C.F.R. §§ 416.920(d) [7], 416.926. (AR 553-63.) For an impairment to meet disability classifications, impairment must be severe enough to

---

[7] 20 C.F.R. 416.920(d) provides the following: "When your impairment(s) meets or equals a listed impairment in appendix 1. If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience."

preclude gainful activity. 20 C.F.R. § 416.925. To determine whether Plaintiff's impairment met this standard, Dr. Meenakshi reviewed all evidence and analyzed Plaintiff against a four-tier rating system. (AR 561.) This rating system is composed of four degrees, ranging from mild, moderate, marked, and extreme. Of the four values, only "marked" or "extreme" satisfy the functional criterion for disability under listings 12.02 (organic mental disorder) and 12.04 (affective mental disorder). 20 C.F.R. § 416.925(b)(ii).

Dr. Meenakshi concluded that Plaintiff's organic and affective disorders present mild limitations to activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and found Plaintiff did not experience repeated episodes of decompensation. (AR 561.) Accordingly, Dr. Meenakshi did not determine Plaintiff presented marked or severe impairments, and therefore concluded that Plaintiff could perform activities of daily living and perform tasks with limited public contact because of his statement that he has a bad temper. (AR 563.)

### e) Mental Residual Functional Assessment by Dr. Funkenstein

Dr. Funkenstein thereafter reviewed Dr. Meenakshi's residual functional assessment of the Plaintiff and affirmed his conclusions. (AR 604.)

## C. Other Evidence in the Record

### 1) Third-Party Function Reports

Both Plaintiff's aunt and grandmother submitted third-party function reports regarding Plaintiff's behavior. (AR 441-446, 464-471.) Plaintiff's grandmother, Tonda Graves, stated that Plaintiff's depression and anxiety attacks have become more extreme and that he has become more aggressive talking about how he wants to kill himself. (AR 441.) She further stated that he has to be reminded to bath, change his clothes, and comb his hair. (AR 444.) His aunt, Teria Wortham, stated that he need reminders to bath and comb his hair, and that he cannot cook because he might burn the house down or throw the food away because he becomes frustrated. (AR 466.) He will take the trash out when he is not mad, but he is not a good person to ask to do things because he easily becomes upset. (*Id*.) He cannot pay bills himself. (AR 467.) Finally, "nobody wants to be around him because he always thinking somebodys against him." (AR 468.)

## II. ALJ HEARINGS

On June 18, 2014, Plaintiff appeared at his initial hearing before ALJ Katherine Loo in person, represented by counsel. During this hearing, only Plaintiff testified. (AR 28.) A supplemental hearing was conducted one month later to permit counsel to provide updated medical records and address how Plaintiff meets the standard for organic mental disorder. (AR 47.) Plaintiff and vocational expert ("VE") Christopher Salvo testified during the supplemental hearing.

### A. Plaintiff's Testimony

#### 1) June 18, 2014 Hearing

Plaintiff has never held a job and lacks a consistent place to live. (AR 40.) Plaintiff was treated by a psychiatrist, but he experienced difficulty in maintaining visits due to inadequate transportation. (AR 37.) Plaintiff does not know how to drive, and does not understand how public transportation works so he is dependent on others, mostly his grandmother, for transportation. (AR 41.) Plaintiff also indicated that he suffers from anxiety attacks that often result in bouts of anger, which has prompted him to avoid social interactions in an effort to prevent getting into fights with others. (AR 37, 42-43.)

Plaintiff was initially prescribed Zoloft, but it upset his stomach so his doctor changed his prescription to Seroquel. (AR 38.) He suffers from depression and anxiety, which he attributes to his father's death when he was very young. (AR 43.) His bouts of depression last for differing intervals, from a few hours to an entire day. (*Id.*)

Plaintiff stays home and he prefers to close himself in his room to prevent being bothered. He does not read books or magazines, nor does he watch television. (AR 41.) He is unable to prepare meals for himself because he does not know how. (AR 41.) He does not run errands or go shopping without help. (AR 43.)

#### 2) Plaintiff's July 17, 2014 Supplemental Hearing Testimony

Plaintiff indicated he visited West County Adult Mental Health Center approximately two to three months prior, and met with Dr. Wang. (AR 51.) He was prescribed new medication because the Seroquel was upsetting his stomach, but did not know the name or when he would

United States District Court
Northern District of California

begin the dosage. (AR 50-52.) When questioned by the ALJ regarding non-compliance with taking medication, Plaintiff explained that he was taking the medication (in this case, Remeron) but his physician decided to switch to a new medication because "something was going to work better." (AR 53.) The ALJ also questioned Plaintiff about the treatment notes from February 2014 when he indicated he was stranded in Sacramento. (AR 55.) The ALJ asked Plaintiff how he became separated from the person he went to Sacramento with and Plaintiff testified that "they had something they had to do and I was, you know, just by myself and, you know, I guess I walked off and next thing you know I didn't –you know, they wasn't there not more." (AR 55-56.) Plaintiff was stranded in Sacramento for a few days. (AR 55.)

When asked by the ALJ if he had any physical issues, Plaintiff testified that his stepfather was abusive during his childhood and he could not be certain as to whether he had any physical problems as a result of this abuse. (AR 56.)

## B. Vocational Expert's Testimony[8]

The ALJ presented Vocational Expert ("VE") Christopher Salvo with a hypothetical of an individual of Plaintiff's age with no work history who was limited to simple routine tasks. (AR 59.) The individual can maintain adequate pace or persistence for simple routine tasks, maintain attention and concentration for two-hour increments with normal breaks and can have occasional interaction with coworkers, supervisors, and the public. (Id.) The VE testified that such an individual could perform the job of a small products assembler (DOT code 706.684-022, SVP 2, of which there are 5,000 positions in California and at least 35,000 throughout the United States), production assembler (DOT code 706.687-010, SVP 2, of which there are at least 1,000 positions in California and 8,000 throughout the United States), car washer (DOT code 915.667-010, SVP 2, of which there are 6,000 positions in California and 50,000 throughout the United States).[9]

---

[8] The ALJ also had a medical expert scheduled to testify at the hearing, but after Plaintiff's counsel objected because she was not previously aware that a medical expert would testify and requested permission to submit additional questions in writing because she was not prepared, the ALJ decided to cancel the Medical Expert saying "I want to move on with this case and if you want – we don't need to take the medical expert's testimony." (AR 57-58.)
[9] The VE explained that he was cutting his normal numbers in half because he placed the car washer in a large working facility where the position is limited to drying the car and cleaning the inside, but does not deal with the public.

The ALJ then asked a second hypothetical regarding a person who is limited to simple routine tasks, occasional interaction with coworkers, supervisors, and the public, who had difficulty with attention and concentration, and can maintain a normal work schedule for 20 percent of the time. (AR 60.) The VE testified that this would eliminate the jobs he previously testified to as well as all other jobs. (*Id.*)

Plaintiff's attorney asked the VE if a person with the additional limitation of an explosive temper causing him to leave the worksite once a week could perform work. The VE testified that he could not. (AR 61.) Likewise, an individual who was unable to follow verbal directions would be unable to perform any work. (*Id.*)

## III. THE ALJ'S FINDINGS

In a July 30, 2014 written decision, the ALJ found Plaintiff not disabled under Section 1614(a)(3)(A) of the Social Security Act, taking into consideration the testimony and evidence, and using the SSA's five-step sequential evaluation process for determining disability. (AR 11-21.)

The ALJ does not address the first step, but it does not apply as Plaintiff does not possess any work history and this step is not used for redetermining disability at age 18. *See* 20 C.F.R. § 416.987(b).

At the second step, the ALJ concluded that Plaintiff possessed the following severe impairments: depressive disorder and post-traumatic stress disorder. (AR 13.) The ALJ stated these impairments cause "more than minimal functional limitations." (AR 14.) The ALJ also found that Plaintiff carried a diagnosis of status post abscess of the right elbow as a medically determinable impairment. (*Id.*) However, there was no evidence to support significant limitations or restrictions arising from this condition, and the ALJ found the abscess nonsevere. (*Id.*)

At the third step, the ALJ concluded that since February 1, 2012, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926). (*Id.*) The ALJ considered the listings of 12.02 – organic mental disorder, 12.04 – affective disorder, 12.05 – mental retardation, and 12.06 – anxiety related disorder. (AR

12

14-15.)  The ALJ found insufficient evidence to satisfy the requisite criteria enumerated under the listings.  (AR 14.)  The ALJ found Plaintiff has mild restriction in his activities of daily living, citing his independence with personal grooming and hygiene, ability to carry out various activities of daily living, including preparing simple meals, washing dishes, doing laundry, taking out the trash, and getting groceries.  (*Id.*)  The ALJ also found that Plaintiff is moderately limited in social functioning, noting that although he indicates difficulty interacting with others, he is able to socialize with family and friends, and is able to take walks and go to the store.  Finally, the ALJ found that Plaintiff has moderate difficulties with concentration, persistence, or pace and has not experienced any episodes of decompensation.  (AR 14-15.)  Because Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and repeated episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.  (AR 15.)

With respect to the listings, the ALJ found that Plaintiff does not meet listing 12.02 for organic mental disorder based on Plaintiff's lack of a specific history, physical examination, or laboratory test to demonstrate the presence of a specific organic factor related to the abnormal mental state.  (*Id.*)  The ALJ likewise concluded that Plaintiff does not meet listing 12.05 for mental retardation because it requires dependence on others for personal needs, including toileting, eating, dressing or bathing – which the ALJ determined not to be the case here.  The threshold for disability on this basis is an IQ of 59, but the ALJ found "no persuasive reason why the claimant's IQ dropped, particularly in the absence of treatment."[10]  (*Id.*)  Similarly, the ALJ found the "paragraph C" criteria of listing 12.05 unmet because Plaintiff does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing a significant work-related limitation of function.  (AR 16.)  Finally, listing 12.06 was unmet because Plaintiff's impairments do not meet "paragraph B" or "paragraph C" criteria of listing 12.05. (*Id.*)

_____

[10] Childhood records indicated Plaintiff possessed a full scale IQ of 74, but subsequent records placed his full scale IQ at 52.

At the fourth step, the ALJ concluded that Plaintiff has the residual capacity to perform a full range of work since February 1, 2012 within specific parameters: Plaintiff is "limited to simple, repetitive tasks; he can maintain adequate pace or persistence for simple, repetitive tasks; he can maintain attention and concentration in two-hour increments with normal breaks; and he can have occasional interaction with coworkers, supervisors, and the public." (*Id*.) The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but questioned Plaintiff's credibility concerning intensity, persistence, and limiting effects of his impairments. (AR 17.)

As to opinion evidence, the ALJ assigned "some weight" to the non-examining State agency psychological consultant's opinions with regard to plaintiff's mental limitations. (AR 18.) The ALJ placed similar weight on the State Agency's non-examining medical consultant's opinion regarding Plaintiff's physical impairments. (*Id*.) The ALJ placed "little weight" on the opinion of Dr. Khoi, the psychological consultative examiner because her opinions and assignment of a GAF score of 50 was inconsistent with her findings and the record. The ALJ also placed "little weight" on the medical opinion of Plaintiff's treating physician, Dr. Wang, because his assignment of a GAF score of 50 also was not supported by medical evidence. (AR 18-19.)

At the fifth step, the ALJ found that there was other work in the national economy that Plaintiff could perform, such as the representative occupations of small-products assembler, of which there exist 5,000 jobs in California, production assembler of which there are at least 1,000 positions in California, and car washer, of which there are 6,000 positions in California. (AR 20-21.)The ALJ therefore concluded the Plaintiff was not disabled under the Social Security Act. (*Id*.)

**IV. APPEALS COUNCIL**

Plaintiff filed a request for review on September 23, 2014, arguing that the ALJ committed errors of law and that her decision was not supported by substantial evidence, and was thus an abuse of discretion. (AR 507-508.) The Appeals Council denied Plaintiff's appeal on February 17, 2016, concluding there was no reason to grant review on the basis of abuse of discretion, or any

United States District Court
Northern District of California

other reason.  (AR 2.)  In reaching this decision, the Appeals Council considered the entire record

and a recording of the hearing.  The Appeals Council's decision rendered the ALJ's opinion final.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the Court has authority to review an ALJ's decision to

deny benefits.  When exercising this authority, however, the "Social Security Administration's

disability determination should be upheld unless it contains legal error or is not supported by

substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Andrews v.*

*Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion"; it is "more than a mere scintilla, but may be less than a

preponderance."  *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012)(internal citations and

quotation marks omitted); *Andrews*, 53 F.3d at 1039 (internal citations and quotation marks

omitted).  To determine whether the ALJ's decision is supported by substantial evidence, the

reviewing court "must consider the entire record as a whole and may not affirm simply by

isolating a specific quantum of supporting evidence."  *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th

Cir. 2012) (internal citations and quotation marks omitted).

Determinations of credibility, resolution of conflicts in medical testimony, and all other

ambiguities are roles reserved for the ALJ.  *See Andrews*, 53 F.3d at 1039; *Magallanes*, 881 F.2d

at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the

record."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and

quotation marks omitted); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1198 (9th Cir.

2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we

must defer to the ALJ's conclusion.")  "The court may not engage in second-guessing."

*Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding

contrary to that reached by the Commissioner; the Commissioner's determination as to a factual

matter will stand if supported by substantial evidence because it is the Commissioner's job, not the

Court's, to resolve conflicts in the evidence."  *Bertrand v. Astrue*, No. 08-CV-00147-BAK, 2009

WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).  Similarly, "[a] decision of the ALJ will not be

reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court can only affirm the ALJ's findings based on reasoning that the ALJ herself asserted. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). In other words, the Court's consideration is limited to "the grounds articulated by the agency[.]" *Cequerra v. Sec'y*, 933 F.2d 735, 738 (9th Cir. 1991).

**DISCUSSION**

Plaintiff contends that the ALJ erred as a matter of law by (1) improperly weighing the medical opinion evidence; (2) incorrectly evaluating Plaintiff's credibility and the statements of his relatives; (3) not fully developing the record; and (4) finding Plaintiff capable of performing work. Plaintiff urges the Court to grant summary judgment and remand for payment of benefits, or in the alternative, further proceedings.

## I. ALJ'S CONSIDERATION OF MEDICAL OPINION EVIDENCE

### A. Legal standard

In the Ninth Circuit, courts must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as amended (Apr. 9, 1996)). "A treating physician's opinion is entitled to more weight than that of an examining physician, and an examining physician's opinion is entitled to more weight than that of a nonexamining physician." *Orn*, 495 F.3d at 631. If a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). And "even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Lester*, 81 F.3d at 830 (internal citations and quotations omitted). Likewise, "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id*. at 830–31.

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts

and conflicting medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (internal citation omitted). Ultimately, "the ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988).

"When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 795 F.3d at 1012-13 (internal citation omitted). In conducting its review, the ALJ "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence." *Hill*, 698 F.3d at 1159 (internal citations omitted). "An ALJ may not cherry-pick and rely on portions of the medical record which bolster his findings. *See, e.g., Holohan v. Massanari*, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding that an ALJ may not selectively rely on some entries and ignore others "that indicate continued, severe impairment"). "Particularly in a case where the medical opinions of the physicians differ so markedly from the ALJ's[,]" "it is incumbent on the ALJ to provide detailed, reasoned, and legitimate rationales for disregarding the physicians' findings." *Embrey*, 849 F.2d at 422.

**B.    Analysis**

To reject the opinions of Plaintiff's treating physician, Dr. Wang, and the examining physician, Dr. Khoi, in favor of those of the non-examining consultants, Drs. Meek, Meenakshi and Funkenstein, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for doing so. *See Lester*, 81 F.3d at 830-31. The ALJ did not do so.

**1) Dr. Khoi**

The ALJ "place[d] little" on the opinion of Dr. Khoi, the state agency consultative examiner, because her opinion was "inconsistent with her findings and the record." (AR 18.) The

ALJ cited three reasons for this conclusion: (1) although Dr. Khoi's testing indicated that Plaintiff had a full scale IQ of 54, she diagnosed him with a cognitive disorder and borderline intellectual functioning; (2) Dr. Khoi's diagnosis of cannabis use/abuse based on Plaintiff's self-reported occasional use; and (3) Dr. Khoi's assigned GAF score of 50 was unsupported by the record because "the record indicates that he is able to perform a variety of daily activities and that he has some difficulty with social interactions." (*Id.*) These reasons are neither specific and legitimate nor were they supported by substantial evidence.

First, with respect to Plaintiff's IQ, the basis for the ALJ's critique is unclear. On the one hand, the ALJ appears to take issue with the fact that although the testing indicated that Plaintiff had an IQ of 54, Dr. Khoi only diagnosed him with borderline intellectual functioning and a cognitive disorder (as opposed to mental retardation). But on the other hand, the ALJ appears to dispute the validity of the IQ score of 54 given that his childhood IQ testing put Plaintiff at an IQ of 74. However, Dr. Khoi herself noted the inconsistency and stated that "[a]lthough his Full Scale IQ fell in the extremely low range his cognitive functioning is more commensurate with borderline intellectual functioning"—which is what she diagnosed him with. (AR 547.) Dr. Khoi's diagnosis thus sought to address the disconnect she noted between her observation of Plaintiff and his history, and his performance on the test. There is no credible reason to discount her opinion on this basis. *See Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) ("We require the ALJ to build an accurate and logical bridge from the evidence to her conclusions so that we may afford the claimant meaningful review of the SSA's ultimate findings.").

Second, there is nothing inconsistent about Dr. Khoi listing cannabis use under her diagnosis in light of Plaintiff's testimony that he smokes marijuana occasionally and last smoked the preceding week.

Finally, the ALJ's conclusion that Plaintiff's GAF score of 50 was not supported by the record is incorrect. Plaintiff's own treating physician Dr. Wang likewise assigned Plaintiff a GAF score of 50. Further, the ALJ failed to cite to any examples to support her conclusion that the "records indicates that [Plaintiff] is able to perform a variety of daily tasks." (AR 18.) In fact, the record suggests just the opposite. Plaintiff testified that he depends on his grandmother or aunt for

transportation, he does not presently have a place to live and is staying with a friend where he shuts himself in a room all day and does not watch television or read, he cannot run errands, and he needs help paying for things. (AR 41-43) Likewise, in his function report, Plaintiff indicated that he needs reminders for all aspects of his personal care, that he does not cook because he is afraid of burning down the house, that he cannot pay bills himself, and that he cannot take public transportation by himself. (AR 453-455.)

Indeed, the record citations that the ALJ provides earlier in her opinion with respect to Plaintiff's activities of daily living fail to support the ALJ's conclusion. The ALJ cites to the reports of Drs. Khoi (AR 545) and Dr. Chen (AR 536), as well as Plaintiff's self-reported activities of daily living (AR 120)[11]. However, Dr. Khoi explicitly stated that Plaintiff "is able to do all activities of daily living, w*ith restrictions because he is '*easily frustrated*.'*" (AR 545.) With respect to Dr. Chen's statements regarding Plaintiff's activities of daily living, the ALJ otherwise gave little weight to Dr. Chen's opinion, and as noted above, Dr. Chen was subsequently prohibited from providing opinions because of his "unprofessional manner and failure to adequately correct deficiencies in his CE reports." (Dkt. No. 15-1.) Finally, Plaintiff's self-reported activities of daily living, which the ALJ cites, do not support that he can perform daily tasks. *See, e.g.*, AR 120 ("he stated that he is unable to do simple instructions," "difficulties in attention and concentration in doing tasks," "forgetting to take care of his personal grooming at times," "he does not do shopping."). Thus, the ALJ erred in rejecting Dr. Khoi's opinion regarding the GAF score which was corroborated by Plaintiff's treating physician. *See Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir.1996) (ALJ could not reject an uncontroverted and corroborated opinion on a basis that ALJ failed to develop fully).

---

[11] It is unclear why the ALJ failed to consider the third-party function reports submitted by Plaintiff's aunt and grandmother (AR 441-446, 464-471), which would have provided additional information regarding Plaintiff's activities of daily living. *See Molina*, 674 F.3d at 1114 (ALJ must "consider testimony from family and friends submitted on behalf of the claimant" but does not need to "provide express reasons for rejecting testimony from each lay witness"); *see also Udell v. Colvin*, 628 F. App'x 539, 540 (9th Cir. 2016)(" Because the ALJ did not provide any, let alone clear and convincing, reasons for rejecting the lay testimony, we have no way to determine whether any error materially impacted the ALJ's ultimate decision.").

In sum, the ALJ failed to offer specific and legitimate reasons supported by substantial evidence to reject Dr. Khoi's opinion.

### 2) Dr. Wang

Dr. Wang did not submit a function report on Plaintiff's behalf, but his treatment notes assign Plaintiff with a GAF score of 50. The ALJ gave little weight to this assessment because it was based primarily on claimant's complaints. (AR 19.) The ALJ noted that although the treatment notes indicated that Plaintiff complained of feeling bad, grumpy, or angry, Plaintiff failed to take his medication consistently. The ALJ also noted that Plaintiff could "perform household chores, listen to music, and watch tv, as well as socialize with family and friends." (*Id.*) For this, the ALJ again cited to Dr. Khoi's and Dr. Chen's reports; however, as discussed above, these reports are not substantial evidence supporting the ALJ's conclusion. Moreover, in citing to these examples, the ALJ wholly ignored Plaintiff's testimony at his hearing that he no longer watches television, listens to music, or socializes, and instead, he closes himself in his room and does none of those things. (AR 41.)

With respect to Plaintiff's failure to regularly take his medication, the ALJ ignores Plaintiff's repeated complaints regarding the stomach discomfort he experiences with his medication. (AR 691, 709, 748, 759, 763.) Similarly, the ALJ fails to acknowledge that someone who has borderline intellectual functioning and routinely forgets to bathe or engage in other aspects of personal care, could quite likely also have difficulty remembering to take his medication. "[A]n adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) (internal citation and quotation marks omitted).

The ALJ's burden to provide specific and legitimate reasons for rejecting the opinion of a treating physician is met "by providing a detailed summary of the facts and conflicting clinical evidence, along with a reasoned interpretation thereof." *Rodriguez v. Bowen*, 876 F.2d 759, 762

20

(9th Cir. 1989). The ALJ's conclusory disregard of Dr. Wang's opinions fails to satisfy this standard.

*** 

In sum, the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for discounting the opinions of the treating and examining physicians in favor of the opinions of the non-examining consultative physicians. *See Lester*, 81 F.3d at 830-31.

## II. THE ALJ'S CREDIBILITY DETERMINATION

### A.      Standard for Assessing Credibility

The SSA policy on determining RFC directs ALJs to give "[c]areful consideration ... to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone." SSR 96-8P, 1996 WL 374184, at *5 (S.S.A. July 2, 1996). If the record establishes the existence of an impairment that could reasonably give rise to such symptoms, the "ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006); *see also Chaudhry v. Astrue*, 688 F.3d 661, 670 (9th Cir. 2012) ("Because the RFC determination must take into account the claimant's testimony regarding [her] capability, the ALJ must assess that testimony in conjunction with the medical evidence.").

To "determine whether a claimant's testimony regarding subjective pain or symptoms is credible," an ALJ must use a "two-step analysis." *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotation marks omitted). "Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal citations and quotation marks omitted). The clear and convincing standard is "the most demanding required in Social Security cases." *Moore v. Comm'r of the Soc. Sec. Admin.*, 278

F.3d 920, 924 (9th Cir. 2002).  "General findings are an insufficient basis to support an adverse credibility determination."  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).  Rather, the ALJ "must state which pain testimony is not credible and what evidence suggests the claimant[ ][ is] not credible."  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.") (citation omitted).

## B.      Analysis

The ALJ concluded that Plaintiff's testimony regarding the severity and functional consequences of his disability was not fully credible because: (1) he provided inconsistent testimony about when he left school; (2) he only takes his medication sporadically; and (3) he gave inconsistent testimony regarding his marijuana use.  (AR 19.)

The ALJ's reasons for discounting Plaintiff's credibility do not comport with the "clear and convincing" standard.  First, the ALJ erred in relying on the first and the third grounds because the purported inconsistencies do not relate to Plaintiff's disability allegations, but instead go to his character generally.  The ALJ must tie Plaintiff's allegedly inconsistent statements regarding when he left school and his marijuana use to his allegations regarding disability.  It is not enough to simply say that Plaintiff is not credible because his testimony about matters unrelated to his disability was inconsistent "without further corroboration or explanation" as to why *these* inconsistencies undermine the disability allegations.  *See, e.g.*, *Messee v. Colvin*, No. 2:16-CV-01259-DWC, 2017 WL 243355, at *3 (W.D. Wash. Jan. 20, 2017) (rejecting adverse credibility finding where the "ALJ merely noted Plaintiff reported inconsistencies regarding her substance use and a physician questioned Plaintiff's prescription drug use"); *see also Walsh v. Comm'r of Soc. Sec. Admin.*, No. CV-15-02466-PHX-GMS, 2017 WL 1130366, at *10 (D. Ariz. Mar. 27, 2017) (noting that the ALJ improperly relied on plaintiff's inconsistency regarding marijuana use as a basis for the adverse credibility finding because substance abuse had no bearing

on the disability determination)[12].   Further, these alleged inconsistencies are wholly consistent

with Plaintiff's allegation of cognitive disability; that is, it is unsurprising that someone who was

diagnosed with a cognitive disorder and borderline intellectual functioning would have memory or

sequencing issues.  Indeed, the medical evidence reflects that Plaintiff's memory is "poor" or

"fair" and he had "extremely low" results on his memory test during the psychological testing.

(AR 546, 625.)

The second basis—that Plaintiff inconsistently takes his medication—is also not a

sufficient basis for the adverse credibility determination.  Contrary to the ALJ's unsupported

statement that Plaintiff did not complain about nausea "until several months after" (AR 19), the

record reflects that Plaintiff consistently complained of nausea and that he did not feel the

medication was working for him.  (AR 691 (8/15/13 reports some nausea); 709 (9/19/12 reports

some nausea); 748 (4/24/14 reports "GI disturbance" and not sure if Remeron helped); 759 (2/7/14

reports "GI upset" did not feel medication was having any effect); 763 (6/19/14 complains of GI

issue, reports things have not changed).)  At his second hearing, Plaintiff testified that his

medication has been switched several times because it was upsetting his stomach and he currently

took Seroquel every day, although it too upset his stomach.  (AR 52-53.)  The ALJ's conclusion

United States District Court
Northern District of California

---

[12] In 2016, the Social Security Administration issued Social Security Ruling 16-3p, which supersedes S.S.R. 96-7p and states that "[i]n evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation."  This ruling emphasizes that inconsistency between a claimant's allegations of disability and evidence in the record may not be used broadly to discredit the claimant's credibility but only insofar as the evidence contradicts a specific assertion relevant to the disability determination.  *Walsh*, 2017 WL 1130366, at *10; *see also Sherrard v. Colvin*, No. 16-CV-02353-EMC, 2017 WL 878063, at *8, n. 6 (N.D. Cal. Mar. 6, 2017) (discussing whether SSR 16-3p applies retroactively); *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.").  The Court's decision here that the ALJ erred in relying on inconsistencies unrelated to Plaintiff's disability allegations is not predicated on the new Social Security Ruling and thus the Court makes no finding as to whether the ruling applies retroactively; however, on remand, the ALJ must follow SSR 16-3p for any credibility finding.

that Plaintiff failed to timely complain about the stomach issues is thus not supported by clear and convincing evidence. Further, discounting a plaintiff's testimony regarding the severity of his symptoms based on his failure to seek psychiatric treatment—or in this case consistently take medication for depression—ignores the underlying mental health issues. *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)("[a]ppellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.") (internal citation omitted).

In sum, the ALJ failed to explain *how* Plaintiff's inconsistent statements regarding his marijuana use, schooling, and medication undermined his testimony regarding his disability. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884 (9th Cir. 2006). As such, her reasons for discounting plaintiff's testimony were not specific, or clear and convincing.

## III. PLAINTIFF'S REMAINING ARGUMENTS

Plaintiff also argues that (1) the ALJ did not fulfill her duty to fully develop the record because she failed to obtain medical expert testimony, and (2) the ALJ erred at step five of the disability analysis because the ALJ did not include all of Plaintiff's impairments in the residual functional capacity analysis, rendering the vocational expert hypotheticals incomplete. The Court need not reach either argument in light of the Court's holding that the ALJ's weighing of the medical evidence and adverse credibility finding were in error. These errors were harmful, as they directly informed the ALJ's RFC, the hypotheticals posed to the VE, and the ALJ's ultimate conclusion that Plaintiff was not disabled. *See Tommasetti*, 533 F.3d at 1038; *see also Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (defining harmless error as such error that is "inconsequential to the ultimate nondisability determination"). The Court therefore remands to the agency as discussed below.

## IV. THE SCOPE OF REMAND

Finally, the Court must determine whether to remand this case to the SSA for further proceedings or with instructions to award benefits. A district court may "revers[e] the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing," *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir.

2014) (citing 42 U.S.C. § 405(g)) (alteration in original), but "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation," *Id.* (citation omitted).

A district court is precluded from "remanding a case for an award of benefits unless certain prerequisites are met." *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) (internal citations and quotations omitted). "The district court must first determine that the ALJ made a legal error, such as failing to provide legally sufficient reasons for rejecting evidence." *Id.* (citation omitted). "If the court finds such an error, it must next review the record as a whole and determine whether it is fully developed, is free from conflicts and ambiguities, and all essential factual issues have been resolved." *Id.* (internal quotation marks and citation omitted). If the record has been so developed, "the district court must consider the testimony or opinion that the ALJ improperly rejected, in the context of the otherwise undisputed record, and determine whether the ALJ would necessarily have to conclude that the claimant were disabled if that testimony or opinion were deemed true." *Id.* If the answer is yes, "the district court may exercise its discretion to remand the case for an award of benefits." *Id.* Each part of this three-part standard must be satisfied for the court to remand for an award of benefits, *id.*, and "[i]t is the 'unusual case' that meets this standard." *Williams v. Colvin*, No. 12–CV6179, 2014 WL 957025, at *14 (N.D. Cal. Mar. 6, 2014) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).).

Notably, district courts "retain 'flexibility' in determining the appropriate remedy [.]" *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1021). Specifically, the court "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" *Id.* (quoting *Garrison*, 759 F.3d at 1021); *see also Connett v. Barnhart*, 340 F.3d 871, 874-76 (9th Cir. 2003) (finding that a reviewing court retains discretion to remand for further proceedings even when the ALJ fails to "assert specific facts or reasons to reject [the claimant's] testimony").) In addition, "[i]f additional proceedings can remedy defects in the original administrative proceedings," the case should be remanded. *Lewin*, 654 F.2d at 635.

Applying these principles here, the Court's conclusion regarding the ALJ's errors in weighing the medical evidence and with respect to the adverse credibility finding meets the threshold requirement of legal error. The next question is whether the record has been fully developed and further administrative proceedings would serve no useful purpose. *Id.* (citation omitted). Not so here. The medical record leaves open the question of Plaintiff's exact disability status. The Court will therefore remand to the ALJ for further proceedings.

Because the matter is being remanded for reconsideration of the medical opinions, and the ALJ must reconsider plaintiff's RFC in light of the record evidence, on remand the ALJ must also provide specific, clear and convincing reasons for discounting plaintiff's subjective symptom testimony, if warranted. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) (citation omitted) (the "ALJ must identify the testimony that was not credible, and specify 'what evidence undermines the claimant's complaints.' "); *Brown-Hunter*, 806 F.3d at 493-94 (the ALJ must identify the testimony he found not credible and "link that testimony to the particular parts of the record" supporting his non-credibility determination).

## CONCLUSION

For the reasons described above, the Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Summary Judgment (Dkt. No. 15) and DENIES Defendant's Cross-Motion for Summary Judgment (Dkt. No. 17).

**IT IS SO ORDERED.**

Dated: May 17, 2017

JACQUELINE SCOTT CORLEY
United States Magistrate Judge